## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Aug 01 2019, 7:56 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Kristin Szczerbik
Lawrence County Public
Defender Agency
Bedford, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Robert J. Henke
Deputy Attorney General
Indianapolis, Indiana

IN THE

# COURT OF APPEALS OF INDIANA

In the Matter of the Termination of the Parent–Child Relationship of: J.P. (Minor Child)

and

R.P. (Father),

*Appellant-Respondent,*

*v.*

The Indiana Department of Child Services,

*Appellee-Petitioner.*

August 1, 2019

Court of Appeals Case No. 19A-JT-421

Appeal from the Lawrence Circuit Court

The Hon. Andrea K. McCord, Judge

The Hon. Nathan G. Nikirk, Juvenile Referee

Trial Court Cause No. 47C01-1810-JT-367

**Bradford, Judge.**

# Case Summary

[1]  J.P. ("Child") was born on May 13, 2011, to R.P. ("Father") and A.C. ("Mother"[1]) (collectively, "Parents"). In May of 2015, Child was living with Mother and was removed from her home following a violent altercation between Mother and another woman over drugs and money. The Indiana Department of Child Services ("DCS") petitioned to have Child adjudicated a child in need of services ("CHINS"), and the juvenile court did so. Despite some initial compliance with ordered services, Father relapsed on methamphetamine in September of 2016, which ultimately resulted in the revocation of the probation he was serving at the time and incarceration. Following Father's incarceration, he did not engage with DCS again or complete any services. Following an arrest in February of 2017, Father also stopped participating in visitation.

[2]  In October of 2018, DCS filed its petition to terminate Parents' parental rights to Child ("TPR Petition"). A hearing was held in January of 2019, at which Father testified that he had failed to engage with DCS due to incarceration, homelessness, and/or indigency. The DCS family case manager ("FCM") and Child's court-appointed special advocate ("CASA") both testified that termination was in Child's best interests and that DCS's permanency plan was for adoption of Child by his current foster parents. On January 24, 2019, the

---

[1]  Mother does not participate in this appeal.

juvenile court ordered termination of Father's parental rights to Child. Father contends that the juvenile court's judgment is clearly erroneous and that DCS denied him due process by failing to provide him with adequate access to services. Because we disagree, we affirm.

# Facts and Procedural History

[3] Child was born on May 13, 2011, to Parents. On June 1, 2015, Child was removed from Parents' care following an altercation between Mother and another woman over drugs and money. Child was placed with relatives of Mother's, where he remains. On June 3, 2015, DCS petitioned to have Child adjudicated a CHINS. On June 26, 2015, the State charged Father with Level 6 felony domestic battery and Level 6 felony criminal confinement in cause number 47D01-1506-F6-727 ("Cause No. 727"). On September 2, 2015, the juvenile court found Child to be a CHINS and ordered that Parents complete several services. The same day, Father pled guilty as charged in Cause No. 727 and was sentenced to two and one-half years of incarceration with one and one-half suspended to probation.

[4] On December 8, 2015, the juvenile court issued an order indicating, *inter alia*, that Parents had not enhanced their abilities to parent Child, complied with services, or visited Child. The juvenile court noted that Father had neither remained in contact with DCS nor completed a substance-abuse evaluation. The juvenile court issued another periodic case review on March 9, 2016, in which it noted that Parents were now compliant with Child's case plan and

cooperating with DCS. On September 2, 2016, the juvenile court's periodic case review indicated that Mother was no longer compliant with Child's case plan, although Father still was. The permanency plan for Child was still reunification, with a projected date of December 1, 2016.

[5] On September 29, 2016, Father tested positive for methamphetamine, marijuana, and tramadol and was arrested. On October 3, 2016, Father admitted that he had violated the terms of his probation in Cause No. 727 and was released four days later, and, on November 16, the trial court re-imposed Father's suspended sentence of 451 days. Also on November 16, 2016, the juvenile court found that Father was no longer compliant with Child's case plan due to his arrest and incarceration.

[6] On March 8, 2017, the juvenile court held a permanency hearing. By this time, Child had been removed from Father's care for approximately twenty-three months. The juvenile court found that Father was not in compliance with the case plan because he had been incarcerated for violation of the terms of his probation in Cause No. 727 from September 29 to October 7, 2016. The court changed the permanency plan to a concurrent plan of reunification and adoption. On March 15, 2017, Father admitted that he had again violated the terms of his probation in Cause No. 727, and the trial court ordered that he execute his previously-suspended sentence. Father was released from incarceration in July of 2017.

[7]     On August 23, 2017, the juvenile court held another permanency hearing. Child had been in the same relative placement for over two years and was progressing well. The juvenile court also found that Father had completed a portion of the Crossover drug-rehabilitation program while incarcerated. Father, however, had failed to set up the post-incarceration portion of the program, missed an appointment with Centerstone, and had no contact with DCS upon his release from incarceration. While Father had made one unsuccessful attempt to contact DCS, he could not provide reliable contact information and had made no further attempts. Following the hearing, the juvenile court changed the permanency plan to adoption.

[8]     On January 10, 2018, the juvenile court held a review hearing. The juvenile court found that Father had not complied with Child's case plan, had not participated in any services or maintained contact with DCS, had not enhanced his ability to fulfill his parental obligations, had not visited Child, and had not cooperated with DCS. On June 28, 2018, the State charged Father with Level 6 felony domestic battery and Class A misdemeanor intimidation in cause number 36CO1-1806-F6-269 ("Cause No. 269").

[9]     On September 19, 2018, the juvenile court held a permanency hearing. The juvenile court found that Child had been in the same relative placement for approximately twenty-seven months and was progressing well in his placement. The juvenile court also found that Father had not complied with Child's case plan. The juvenile court found that it was "most appropriate and consistent"

with Child's best interests "to have a proceeding to terminate the parent–child relationship and be placed for adoption." Ex. Vol. p. 58.

[10] On September 27, 2018, the State charged Father with Level 6 felony marijuana possession, Class B misdemeanor marijuana possession, and Class C misdemeanor paraphernalia possession in cause number 40C01-1809-F6-359 ("Cause No. 359"). Father was arrested in Cause No. 359 on October 24, 2018. Meanwhile, on October 16, 2018, Father had pled guilty in Cause No. 269 to intimidation, and the trial court sentenced him to 365 days of incarceration with 235 days suspended. On October 30, 2018, DCS filed its TPR Petition. On November 26, 2018, the State charged Father with Class B misdemeanor marijuana possession in cause number 40D01-1811-CM-597 ("Cause No. 597"). Eventually, a bench trial was set for February 28, 2019.

[11] On January 18, 2019, the juvenile court conducted an evidentiary hearing on the TPR Petition. At the hearing, Father testified that had been incarcerated in Jennings County in Cause No. 359 for approximately four months and that he had stopped engaging with DCS after relapsing with methamphetamine in 2016. Father had, in fact, been incarcerated for approximately fourteen out of the previous twenty-four months, including incarceration in Jackson County for intimidation in Cause No. 269. Father testified that he had been living in his car prior to his Jackson County incarceration, that he had not visited with Child in more than eighteen months, and that he had not engaged in services when he was not incarcerated because he was homeless.

[12] According to Child's foster mother, when he was placed with her in June of 2015, he was terrified, severely behind regarding things he should have known for a child his age, and he had a severe speech delay. As of the day of the termination hearing, his foster mother described Child as smart, very social, and funny. Child's foster mother testified that she believed it was in Child's best interests to stay with her and her husband and agreed that it would be detrimental to Child "if this process is drug on longer." Tr. Vol. II p. 95. Child has never asked about Father.

[13] FCM Melissa Sears testified that Child has been in the same relative placement for approximately three and one-half years and has never been returned to either Parent's care. After Father's arrest for using methamphetamine and marijuana and subsequent release in the fall of 2016, he stopped engaging in random drug screens and quit his individual therapy. While Father continued visits until he was arrested again in February of 2017, he has not visited Child since. FCM Sears never received any communication from Father but eventually found him incarcerated in September of 2018 after searching for several months. FCM Sears went to the jail to serve Father a summons but was not permitted to see him. FCM Sears left her card for Father but never heard back. FCM Sears testified that Father did not maintain contact with DCS, inform DCS of any changes of address, inform DCS of his arrests or criminal charges, maintain appropriate housing, complete a substance abuse assessment, or obey the law.

[14] As for Child's progress, FCM Sears testified that he was doing well in current placement and was engaging in therapy to address some issues with acting out. Child had developed a good routine in his foster placement and called his foster parents "mom" and "buddy." Tr. p. 71. DCS's plan was for Child to be adopted by his foster family. FCM Sears testified that it is in Child's best interests to terminate Parents' parental rights and for him to be adopted because he needs stability, is receiving the care he needs in his foster placement, and has been in the same stable and loving home for the past three and one-half years.

[15] Child's CASA Paul Smoot tried to contact Father during the CHINS case but was not successful. Father's own legal counsel did not have Father's contact information. CASA Smoot had had contact with Child at least fifteen times in the nineteen months since his appointment in his foster home, at his school when Child was playing basketball, and at a birthday party outside the foster home. CASA Smoot observed that Father had not adhered to the court-ordered services, and, after Father was released from one of his incarcerations, he "disappeared for over a year where nobody could find him until DCS located him in the Jackson County Jail, once again." Tr. Vol. II p. 107. CASA Smoot testified that it was in Child's best interests for the juvenile court to terminate Parents' parental rights to Child. In CASA Smoot's opinion, adoption by Child's current foster family is in his best interests, because they have provided him with a loving, stable home in which he has continued contact with other members of his extended family.

On January 24, 2019, the court ordered termination of Parents' parental rights to Child. The juvenile court's termination order provides, in part, as follows:

1. On June 1, 2015, [Child] was removed from Mother and Father on an emergency basis due to allegations of abuse and/or neglect.
2. Father has been incarcerated 14 of the last 24 months and Father had issues of homelessness prior to his incarceration.
3. Father has not kept in contact with DCS and has not visited with the child since February, 2017.
[…]
6. The child was placed on June 1, 2015 with the foster family with whom he [] still resides. The foster family is pre-adoptive and desires to move forward with said adoption.
7. The parents have failed to participate with DCS services and have failed to comply with the dispositional decree.
8. Mother and Father have had substantial issues with homelessness and drug abuse.
9. [Child] is extremely bonded with his foster placement, his siblings in the foster home, and his environment.
10. The CASA is Mr. Paul Smoot.
11. The CASA testified that [Child] is well cared for by his foster family and that [Child] is doing very well.
12. The CASA has been involved in this case since June, 2017. During that time period the CASA made approximately 15 visits to see the child in Greenwood, Indiana and the CASA attended all Court hearings.
13. The CASA has also talked extensively with [Child]'s school teachers, school counselors and his therapist.
14. The CASA testified that he attempted to set up a time to talk with [Father] in July, 2017. Further, the CASA testified that he attended the review hearings during the pendency of this case and that [Father]'s whereabout[s] were unknown and could not be ascertained from [Father]'s counsel during the pendency of the case.

15.    Lastly, the CASA testified it is in [Child]'s best interest[s] to remain in the foster home and be adopted by his foster placement as the foster parents have provided a loving home and care deeply about the minor child. The CASA testified that [Child] is extremely bonded with his foster parents and that [Child] is tired of being a foster child and wants to be adopted by his foster parents.

[….]

The Child has been removed from the home and custody of Mother and Father and has been under the supervision of DCS for at least fifteen (15) of the most recent twenty-two (22) months, and has been removed from his Mother and Father for more than six (6) months pursuant to the terms of the dispositional decree.

There is a reasonable probability that:

The conditions which resulted in Child's removal and continued placement outside the home will not be remedied by Mother and Father;

That continuation of the parent-child relationship poses a threat to Child's well[-]being.

Termination of parental rights is in Child's best interests.

There is a satisfactory plan for the care and treatment of the Child, that being adoption.

Order pp. 3–4, 6.

# Discussion and Decision

[17]    The Fourteenth Amendment to the United States Constitution protects the traditional right of parents to establish a home and raise their children. *Bester v. Lake Cty. Office of Family & Children*, 839 N.E.2d 143, 145 (Ind. 2005). Further, we acknowledge that the parent–child relationship is "one of the most valued relationships of our culture." *Id*. However, although parental rights are of a

constitutional dimension, the law allows for the termination of those rights when parents are unable or unwilling to meet their responsibilities as parents. *In re T.F.*, 743 N.E.2d 766, 773 (Ind. Ct. App. 2001), *trans. denied*. Therefore, parental rights are not absolute and must be subordinated to the children's interests in determining the appropriate disposition of a petition to terminate the parent–child relationship. *Id.*

[18] In reviewing termination proceedings on appeal, this court will not reweigh the evidence or assess the credibility of the witnesses. *In re Invol. Term. of Parental Rights of S.P.H.*, 806 N.E.2d 874, 879 (Ind. Ct. App. 2004). We only consider the evidence that supports the juvenile court's decision and reasonable inferences drawn therefrom. *Id.* Where, as here, the juvenile court includes findings of fact and conclusions thereon in its order terminating parental rights, our standard of review is two-tiered. *Id.* First, we must determine whether the evidence supports the findings, and, second, whether the findings support the legal conclusions. *Id.* In deference to the juvenile court's unique position to assess the evidence, we set aside the juvenile court's findings and judgment terminating a parent–child relationship only if they are clearly erroneous. *Id.* A finding of fact is clearly erroneous when there are no facts or inferences drawn therefrom to support it. *Id.* A judgment is clearly erroneous only if the legal conclusions made by the juvenile court are not supported by its findings of fact or the conclusions do not support the judgment. *Id.*

[19] Indiana Code section 31-35-2-4(b) governs what DCS must allege and establish to support a termination of parental rights:

(A) that […] the following is true:

    (i) The child has been removed from the parent for at least six (6) months under a dispositional decree.

    [….]

(B) that one (1) of the following is true:

    (i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

    (ii) There is a reasonable probability that the continuation of the parent–child relationship poses a threat to the well-being of the child.

    […]

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2).

[20]    Father contends that DCS failed to establish that termination is in the best interests of Child or that there is a satisfactory plan for the care and treatment of Child. Father also claims that DCS's failure to provide him with adequate services deprived him of substantive due process.

# I. Child's Best Interests

[21]    Father contends that insufficient evidence supports the juvenile court's conclusion that termination is in Child's best interests. We are mindful that in determining what is in the best interests of Child, the juvenile court is required to look beyond the factors identified by DCS and look to the totality of the evidence. *McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). In doing so, the juvenile court must subordinate the

interests of the parents to those of the children involved. *Id*. Moreover, we have previously determined that the testimony of a child's CASA and FCM regarding the child's need for permanency supports a finding that termination is in the child's best interests. *See id.* ("The testimony of [FCM] Fields and [CASA] Dr. Heumann alone is sufficient to support the court's conclusion that termination is in the children's best interests.").

[22] FCM Sears testified that it is in Child's best interests to terminate Parents' parental rights and for him to be adopted because Child needs stability, is receiving the care he needs in his foster placement, and has been in the same stable and loving home for the past three and one-half years. CASA Smoot agreed that it was in Child's best interests for the juvenile court to terminate Parents' parental rights to Child. CASA Smoot testified that adoption with his current foster family would provide Child a loving, stable home in which he has continued contact with other extended family members. While this testimony is likely sufficient by itself to support a conclusion that termination is in Child's best interests, there is more.

[23] The record contains ample and undisputed evidence that Father has significant issues with substance abuse, incarceration, and homelessness, much of which evidence was provided by Father himself. There is also no dispute that Father has not successfully completed even one service ordered by the juvenile court, has not kept in contact with DCS, and has not visited Child since February of 2017. In addition, the record indicates that Child is thriving since his removal from Father's care. When Child was placed with his foster family in June of

2015, he was terrified and developmentally delayed. As of the termination hearing, Child was doing well in current placement and was engaging in therapy to address some issues with acting out. Child has developed a good routine in his foster placement and calls his foster parents "mom" and "buddy." Tr. p. 71. FCM Sears described Child's placement as a "stable and loving home[,]" while CASA Smoot described it as "a loving, stable home where [Child] also has contact with extended family." Tr. Vol. II pp. 71, 108.

[24] Father argues, essentially, that he should be given more time to prove that he can be a good parent to Child, relying on the decisions in *In re G.Y.*, 904 N.E.2d 1257 (Ind. 2009); *Rowlett v. Vanderburgh County Office of Family & Children*, 841 N.E.2d 615 (Ind. Ct. App. 2006), *trans. denied*; and *In re J.M.*, 908 N.E.2d 191 (Ind. 2009). None of these cases help Father, as they are all easily distinguished.

[25] In *G.Y.*, the mother committed a crime before her child's conception. 904 N.E.2d at 1258. Several years later, the mother was arrested and sentenced for her part in the crime after her child had been born. *Id*. at 1258–59. Upon mother's arrest, she arranged for childcare, but that care later failed, and DCS took custody of G.Y. *Id.* at 1259. On transfer, the Indiana Supreme Court concluded there was insufficient evidence to establish that termination was in G.Y.'s best interests. In doing so, the Court noted that the mother had taken what steps she could while incarcerated to better herself, including completing college classes that would help her provide permanency for the child upon her release, making arrangements for housing and employment upon her release,

completing a drug-rehabilitation program, and completing a parenting class. *Id.* at 1262. The mother had also maintained a consistent, positive relationship with G.Y., and, additionally, there was no evidence the mother had a pattern of criminal activity likely to continue upon her release from prison. *Id.* at 1262–63. The Court also noted that Mother was likely to be released soon. *Id.*

[26] The facts of this case contrast sharply with those in *G.Y.* Father's criminal conduct arose shortly after the underlying CHINS case began and continued throughout the case, and he was again incarcerated and awaiting trial on two pending criminal cases by the time of the hearing on the TPR Petition. Father did not complete a single service ordered by the court, has not visited Child since February of 2017, has never been in consistent contact with DCS (even when not incarcerated), and has taken no perceptible steps to improve himself by furthering his education or otherwise improving his employment prospects. Father's one tangible attempt at self-improvement, participation in the Crossover program while incarcerated, did not take: Father did not implement the post-incarceration phase of the program and has been charged with four drug-related crimes since. The facts of this case are clearly a far cry from those in *G.Y.*

[27] Father also seems to argue that his case is analogous to *Rowlett*. In *Rowlett*, an incarcerated parent who was set to be released from prison just six weeks after the scheduled termination filed for a continuance, which request was denied. *Id.* at 618–19. The parent in *Rowlett* had not had a prior opportunity to engage

in reunification services. *Id.* at 617–18. Moreover, while incarcerated, the parent in *Rowlett*

> took steps and made a good-faith effort to better himself as a person and as a parent. […] Father had participated in nearly 1,100 hours of individual and group services, including services in encounters, anger management and impulse control, parenting skills, domestic violence, self-esteem, self-help, and substance abuse. Father had also earned twelve hours of college credit through Ball State University, maintaining a 2.33 grade point average, and at the time of the termination hearing was enrolled in an additional eighteen hours.

*Id.* at 622. We concluded that the juvenile court abused its discretion in denying the parent's request to continue the hearing because under the circumstances he was entitled to "a sufficient period following his release to demonstrate his willingness and ability to assume parental duties." *Id.* at 619. As with *G.Y.*, *Rowlett* is clearly distinguishable from this case, as Father wasted his opportunities to avail himself of services and took no perceptible steps to improve himself or his situation.

[28] Finally, Father's reliance on *J.M.* is misplaced. In *J.M.*, the juvenile court denied DCS's TPR petition based, in part, upon evidence that the parents were being released early from prison and had completed programs during their incarcerations, meaning that the child's permanency was not prejudiced by waiting upon parents' release and waiting to further judge their fitness. *J.M.*, 908 N.E.2d at 194–96. After a panel of this court reversed the juvenile court's denial of the TPR petition, the parents sought transfer, arguing that the court of

appeals had not found the juvenile court's findings to be clearly erroneous and had not relied upon the evidence most favorable to the juvenile court's judgment. *Id*.

[29] The Indiana Supreme Court granted transfer and agreed with parents that the record supported the juvenile court's decision that the parents' "ability to establish a stable and appropriate life upon release can be observed and determined within a relatively quick period of time. Thus, the child's need of permanency is not severely prejudiced." *Id.* at 196. The Indiana Supreme Court concluded that the juvenile court's order was not clearly erroneous and affirmed the juvenile court. *Id*. *J.M.* largely addresses the standard of review in these cases, which is highly deferential, and by which "[a]n appellate court may not substitute its own judgment for that of the trial court if any evidence or legitimate inferences support the trial court's judgment." *Best v. Best*, 941 N.E.2d 499, 502 (Ind. 2011). Because *J.M.* stands for the proposition that the juvenile court's findings should not be disturbed if supported by the evidence, *J.M.* is not really applicable here, where the juvenile court made findings sufficient to terminate Father's parental rights, and those findings are unchallenged. Father has failed to establish error in this regard.

## II. Plan for Care and Treatment of Child

[30] Father briefly seems to argue that DCS failed to establish that it has a satisfactory plan for the care and treatment of Child. DCS's plan for the Child if the juvenile court granted termination is adoption by his current foster

parents. "For a plan to be 'satisfactory,' for purposes of the statute, it 'need not be detailed, so long as it offers a general sense of the direction in which the child will be going after the parent–child relationship is terminated.'" *Lang v. Starke Cty. Office of Family & Children*, 861 N.E.2d 366, 374 (Ind. Ct. App. 2007) (quoting *In re Termination of Parent–Child Relationship of D.D.*, 804 N.E.2d 258, 268 (Ind. Ct. App. 2004), *trans. denied*), *trans. denied*. DCS's plan for adoption by Child's current foster family easily satisfies this test, as even "(a)ttempting to find suitable parents to adopt [the Children] is clearly a satisfactory plan." *Id.* at 375 (citing *Matter of A.N.J.*, 690 N.E.2d 716, 722 (Ind. Ct. App. 1997)). In any event, DCS's plan is more than just a general sense of direction, as FCM Sears and CASA Smoot both testified that the permanency plan for Child was for his current foster parents to adopt him. Father has failed to establish error in this regard.

# III. Due Process

[31] Father also argues that DCS failed to provide services to him during the CHINS case. As an initial matter, there is no indication that Father raised this issue in the juvenile court. To preserve a claim for review, "counsel must object to the trial court's ruling and state the reasons for the objection." *Durden v. State*, 99 N.E.3d 645, 651 (Ind. 2018). Father has waived this issue for appellate review. *Id.* We choose to address this claim on its merits despite Father's waiver.

[32] First, it is worth noting that proof of services offered parents is not an element of termination proceedings. *See In re H.L.*, 915 N.E.2d 145, 148 n.3 (Ind. Ct.

App. 2009) ("failure to provide services does not serve as a basis on which to directly attack a termination order as contrary to law").  That said, even if DCS had been required to establish proof of services, it did so.  The record is clear that Father was provided services, and during 2016 he was cooperating with those services to the point where it appeared he would be engaging in a trial home visit with Child.  Father, however, admitted that he stopped engaging with DCS after he relapsed on methamphetamine in 2016 because he was either homeless and/or in and out of jail.  Father also admitted that while incarcerated he did not reach out to DCS, claiming that he was indigent and did not even have enough money to send a letter.  There is no indication that DCS failed to provide Father services.

[33]  Finally, Father has not demonstrated that he requested additional services from DCS.  *See Prince v. Allen Cty. DCS*, 861 N.E.2d 1223, 1231 (Ind. Ct. App. 2007) ("[T]he responsibility to make positive changes will stay where it must, on the parent.  If the parent feels the services ordered by the court are inadequate to facilitate the changes required for reunification, then the onus is on the parent to request additional assistance from the court or DCS.").  The record indicates that after Father was released from incarceration, he "disappeared for over a year where nobody could find him until DCS located him in the Jackson County Jail, once again" in early fall of 2018.  Tr. Vol. II p. 107.  Father failed to stay in contact with DCS or the CASA in order to be offered services and therefore has no basis to complain now.  *See Jackson v. Madison Cty. Dep't of Family & Children*, 690 N.E.2d 792, 793 (Ind. Ct. App. 1998) ("A parent may

not sit idly by for such an extended period without asserting a need and desire for services and then successfully argue that [he] was denied services to assist [him] with [his] parenting."), *trans. denied*. Father has failed to establish that he was denied due process.

[34] The judgment of the juvenile court is affirmed.

Crone, J., and Tavitas, J., concur.